RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY,

*Plaintiff-Appellant,*

*v.*

ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendants-Appellees.*

┐
│
│
│
├   No. 25-3733
│
│
│
┘

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:24-cv-01657—Pamela A. Barker, District Judge.

Argued: June 4, 2026

Decided and Filed: July 21, 2026

Before: WHITE, THAPAR, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Mark J. Silberman, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Chicago, Illinois, for Appellant. Lisa Hammond Johnson, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellees. **ON BRIEF:** Mark J. Silberman, Christopher T. Grohman, David M. Hopkins, Michael B. Silverstein, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Chicago, Illinois, for Appellant. Lisa Hammond Johnson, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellees.

THAPAR, J., delivered the opinion of the court in which MATHIS, J., concurred, and WHITE, J., concurred in the result. WHITE, J. (pp. 11–17), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

THAPAR, Circuit Judge.  Over fifteen years ago, Congress enacted the Affordable Care Act, intending to dramatically restructure the American health-insurance market.  But some of its provisions appear to have gone unimplemented and unenforced.  In 2024, the American Association of Nurse Anesthesiology sued the Secretary and Department of Health and Human Services to compel them to enforce one such provision that prohibits insurers from discriminating against healthcare providers.  The Association alleged that private insurers were violating the Act by paying nurse anesthetists less than physician anesthesiologists who provide the same services.  And it sought extraordinary relief:  a judicial order requiring an executive-branch agency to take unspecified enforcement actions that the Association speculated would remedy the alleged discrimination.  Because the Association lacks standing, we affirm the district court's dismissal of its claims.

I.

At the Second Battle of Bull Run, nurse Catherine Lawrence provided chloroform to injured soldiers during emergency operations on the battlefield.  William T. Ray & Sukumar P. Desai, *The History of the Nurse Anesthesia Profession*, 30 J. Clin. Anesth. 51, 52 (2016).  In doing so, she made history as the first nurse to administer anesthesia—a service previously provided only by doctors.  *Id.*  From those Civil War roots, a new profession was born:  nurse anesthetist.  Over the 150 years since then, nurses have played a vital role in providing anesthesia.  Nurse anesthetists have supplied independent anesthesia services for medical procedures in every setting that requires anesthesia.  Today, they administer the majority of anesthesia procedures in the United States—over 50 million per year.  And they do so using the same equipment and methods as physicians.

Nurse anesthetists are reimbursed in two different ways, depending on how they practice.  First, they can practice under medical direction, which means the nurse is "supervised" by an anesthesiologist or an operating physician.  R. 1, Pg. ID 8–9.  In that case, the nurse and the

supervising physician evenly split any reimbursement for the procedure. Second, the nurse may practice without medical direction. Until recently, both types of service received equal reimbursement from insurers—100% of the reimbursement rate that physician anesthesiologists receive. So if a physician practicing alone would receive $100 in reimbursement for providing anesthesia, a nurse anesthetist practicing alone would also receive $100 for that procedure, and a nurse practicing under a physician's medical direction would receive $50.

But in 2023 and 2024, two private insurers announced a new policy that changed this scheme. Since then, at least seven more have followed suit. Under the new policies, nurse anesthetists practicing without medical direction receive just 85% of the physician reimbursement rate. So the American Association of Nurse Anesthesiology, an advocacy organization representing America's nearly 74,000 nurse anesthetists, sued the Secretary and Department of Health and Human Services (HHS).

The Association's claims rely on an obscure provision of the Patient Protection and Affordable Care Act (ACA) that bans "discrimination." *See* Pub. L. No. 111-148, § 1201, 124 Stat. 119, 154 (2010) (codified at 42 U.S.C. § 300gg). That provision prohibits insurers from offering coverage or health plans that "discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law." 42 U.S.C. § 300gg-5(a). The Association alleges that insurers are violating this nondiscrimination provision by reimbursing nurse anesthetists at a lower rate than physician anesthesiologists.

The states have primary enforcement authority over the ACA's nondiscrimination provision.[1] *See id.* § 300gg-22(a)(1). However, if the HHS Secretary finds that a state failed to "substantially" enforce the provision, he "shall" do so directly by imposing civil money penalties payable to the federal government. *Id.* § 300gg-22(a)(2), (b)(2)(A), (G). The ACA provides no cause of action for private enforcement.

---

[1]The Departments of Labor and Treasury (and their Secretaries) share ACA enforcement authority for health plans covered by ERISA, 29 U.S.C. § 1132(a)(2), and the Internal Revenue Code, 26 U.S.C. §§ 9834, 4980D, respectively.

In practice, the statutory and regulatory scheme provides almost no guidance about when enforcement of the nondiscrimination provision must (or even should) occur. *See, e.g.*, 45 C.F.R. § 150.301 (providing simply that an entity that fails to comply with the provision "may be subject to a civil money penalty"); *id.* § 150.303 (giving the agency complete discretion to decide when suspected noncompliance "may warrant an investigation"). Since the ACA's passage, HHS has never brought an enforcement action under its nondiscrimination provision. In 2020, Congress required the HHS Secretary to issue a rule implementing the nondiscrimination provision. *See* Pub. L. No. 116-260, § 108, 134 Stat. 1182, 2859 (2020). But the Secretary never issued a rule. So when insurers imposed a lower reimbursement rate for nurse anesthetists, the Association had little recourse beyond publicly asking the Secretary to enforce the provision.

As a result, the Association filed a lawsuit in the Northern District of Ohio, seeking a writ of mandamus compelling the Secretary to enforce the ACA's nondiscrimination provision. The Association contended that HHS "has abdicated its constitutional duty to enforce the law" by failing to enforce the provision or investigate discrimination against nurse anesthetists. R. 1, Pg. ID 22. The Association also brought a claim under the Administrative Procedure Act (APA) to compel agency action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). That claim emphasized HHS's delay by noting its failure to promulgate rules implementing the nondiscrimination provision within the deadlines Congress imposed.

HHS moved to dismiss the complaint for lack of standing and for failing to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(1), (6). The district court granted the motion, concluding that the Association lacked standing. The Association timely appealed.

II.

Article III limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. That means a plaintiff seeking to invoke our jurisdiction must have a "personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). To establish standing, a plaintiff must show that he has suffered (1) an injury in

fact that is likely (2) caused by the defendant's conduct and (3) redressable by a favorable judgment. *Id.*

Here, the Association hasn't established standing in its own right. That's because its mere opposition to HHS's actions (or inaction) or interest in related issues isn't an injury. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). So the Association instead argues that it has associational standing, which allows an organization to sue on behalf of an injured member. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Associational standing requires that (1) at least one of the Association's members otherwise has standing in his own right, (2) the suit seeks to protect interests relevant to the Association's purpose, and (3) the claims and relief involved don't require individual members to participate in the lawsuit. *Id.* We review the district court's dismissal for lack of standing de novo. *Fox v. Saginaw County*, 67 F.4th 284, 292 (6th Cir. 2023).

This case concerns the first associational-standing requirement: whether one or more of the Association's members has standing to sue in his own right. The members alleged a monetary harm, which is a quintessential injury in fact that supports standing. *TransUnion*, 594 U.S. at 425. But they did so for the first time in affidavits attached to their opposition to the Agency's motion to dismiss.[2] The district court declined to consider these affidavits and concluded that the Association's members couldn't satisfy the requirements for standing in their own right. Even assuming the Association properly established an injury in fact, its members can't show that any injury they experienced was fairly traceable to the defendants' conduct and redressable by a favorable judgment. So we agree that they lack standing.

---

[2]The Association argued that if the district court found its affidavits insufficient, it "should be afforded leave to amend the complaint to add individual plaintiffs." R. 13, Pg. ID 117 n.4. But it could have done just that after HHS moved to dismiss. *See* Fed. R. Civ. P. 15(a)(1)(B) (allowing plaintiffs to amend pleadings as a matter of course within 21 days of service of a Rule 12(b) motion). Or it could have sought leave to amend at any time in the nine months between that motion to dismiss and the district court's final ruling. *See* Fed. R. Civ. P. 15(b)(2). But the district court's dismissal for lack of standing is presumptively without prejudice. *See* Fed. R. Civ. P. 41(b); *Taylor v. Owens*, 990 F.3d 493, 496 (6th Cir. 2021). So if the Association chooses to refile, it can attempt to remedy this defect—though maybe not others.

A.

Even if the Association has shown an injury in fact, it hasn't established that the defendants' actions caused that injury. When a plaintiff isn't the object of regulation, but instead challenges the government's "lack of regulation of *someone else*," like the insurers here, standing is "substantially more difficult to establish." *All. for Hippocratic Med.*, 602 U.S. at 382 (cleaned up). While the Association doesn't need to prove causation with certainty (especially at the motion-to-dismiss stage), it "cannot rely on speculation." *Id.* at 383 (cleaned up). Instead, it must present "a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385. The Association hasn't done so here.

The Association alleges its members experienced the injury of lower reimbursement rates for independent anesthesia services. But HHS didn't impose those rates—private insurers did. The Association theorizes that HHS nonetheless caused its injury because those insurers are "[e]mboldened by the government's" failure to enforce the ACA's nondiscrimination provision. R. 1, Pg. ID 4. That causal relationship is too speculative to support standing.

For one thing, the insurers have had plenty of time and opportunity to take advantage of the lack of enforcement, but their policies remained the same. The Association emphasizes that HHS has never enforced the ACA's nondiscrimination provision since its passage in 2010. Why, then, did private insurers wait until 2023 and 2024 to change their reimbursement policies? The Association doesn't explain. To the contrary, it points to one insurer's statement that it altered its reimbursement policy to "better align with [nurse anesthetists'] licensure." Appellant's Br. at 35. Perhaps the insurers indeed changed their policies in response to licensure concerns. Or perhaps they did so because of evolving market conditions, provider availability, practitioner preferences, or any number of other reasons. The Association hasn't explained, so we can only speculate about why these third parties suddenly changed their behavior when HHS hasn't promulgated any new regulations. Such speculation isn't enough to show causation.

Even assuming that government inaction caused its members' injuries, the Association doesn't explain why *the defendants'* inaction in particular did so. Recall that the states have primary authority to enforce the ACA's nondiscrimination provision. *See* 42 U.S.C. § 300gg-

22(a)(1).   The Secretary and HHS—the named defendants here—may step in only if the Secretary makes a determination that a state has failed to do so. *Id.* § 300gg-22(a)(2).  Indeed, if the states enforced the provision, federal action would be neither necessary nor authorized. *See id.*  So why are the Secretary and HHS—rather than the states—to blame here?  At bottom, tracing the Association's injury to HHS and the Secretary alone doesn't account for the states, who have primary enforcement authority.

In response, the Association argues it has standing because the third-party insurers "likely react" to HHS's inaction "in predictable ways that . . . likely cause" its members' injuries. Appellant's Br. at 20 (citing *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025)).  It's true that regulatory action (or inaction) can cause third-party reactions elsewhere that support standing. *Diamond Alt. Energy*, 606 U.S. at 116.  But those reactions must be "predictable," not "speculative." *Id.* at 112 (quotation omitted).  For instance, the Supreme Court recently held that fuel producers had standing to challenge regulations requiring car manufacturers to produce fewer gasoline-powered cars. *Id.* at 104–05.  Because the regulations would decrease gasoline purchases, they would likely cause monetary injuries to the fuel producers. *Id.* at 113–14.

But this case is far different.[3]  In *Diamond*, the government imposed a regulation with "coercive" effect on auto manufacturers. *Id.* at 116 (citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).  So the automakers' response (fewer gasoline-powered cars) that caused the fuel producers' injury (lower gasoline sales) was "predictable." *Id.* at 112 (quotation omitted). That's because when the government regulates, companies *must* comply—or face consequences. In contrast, when the government doesn't act, companies continue to operate as normal, responding to consumers and markets, not regulations.  That's the case here:  The insurers retain "legitimate discretion" over their reimbursement practices, which "breaks the chain of constitutional causation." *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021).

---

[3]We agree with our concurring colleague that cases like *Diamond* can support causation when rational actors (like the insurance companies) respond to government action in predictable ways. *Diamond Alt. Energy*, 606 U.S. at 112.  But those cases involve affirmative government action with coercive effects. *See, e.g.*, *id.* at 106–07 (limiting production of conventional cars and requiring production of electric ones); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 4 (D.C. Cir. 2017) (prohibiting harvest of timber from certain land); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 101 (2d Cir. 2018) (setting maximum fuel economy standard). No court has extended that line of cases to government *in*action, and we decline to do so here.

If nonenforcement of the ACA's nondiscrimination provision would predictably lead to reimbursement policies like the ones cited here, why didn't it for over a decade? Why have only some insurers joined in? Because insurers didn't implement the challenged policies for over a decade after the alleged nonenforcement started, the Association hasn't shown that an insurer would "likely react" to HHS's inaction by cutting reimbursements for its members.

At bottom, the Association can't trace its members' injuries to the Secretary and HHS. Federal courts adjudicate concrete disputes—we aren't "continuing monitors of the wisdom and soundness of Executive action." *Allen v. Wright*, 468 U.S. 737, 760 (1984) (quotation omitted). While the injury-in-fact requirement ensures the proper plaintiff has come into court, the causation requirement ensures the plaintiff has selected the proper defendant. *Cf.* William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 155, 178–79 (2023). The Association hasn't done so here.

B.

Additionally, no member of the Association can show that his injury is likely redressable by a favorable outcome in this lawsuit. Redressability requires that it's "likely, as opposed to merely speculative," that a judgment will remedy the plaintiff's injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). Here, the Association requests an order requiring HHS to "comply with its statutory obligations to enforce the nondiscrimination provision of the ACA." R. 1, Pg. ID 25. But the ACA's nondiscrimination provision commits enforcement discretion to the Secretary.[4] 42 U.S.C § 300gg-22(a)(2); *see also Heckler v. Chaney*, 470 U.S. 821, 832 (1985). So if a court issued such an order, it's speculative what the Secretary would do in discharging his enforcement responsibility. It's also speculative how an insurer would respond to enforcement. As a result, it's unclear whether the Association's requested relief would redress its members' injuries.

---

[4]Indeed, the government argues that we can't even review the agency's enforcement (or nonenforcement) decisions because they're "committed to agency discretion by law." Appellee's Br. at 25 (quoting 5 U.S.C. § 701(a)(2)). Because we resolve this case on standing grounds, we don't reach that argument and take no position on whether the Association's claims could succeed on the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

First, a court order could only initiate the enforcement process. Before the Secretary can enforce the nondiscrimination provision at all, he must first make a finding that the states have "substantially" failed to enforce it themselves. 42 U.S.C. § 300gg-22(a)(2). While we could direct the Secretary to *consider* whether the states failed to substantially enforce the statute, that would only trigger a regulation stating the agency "*may* initiate [a] process" to determine whether it agrees and wants to act. 45 C.F.R. § 150.203(b) (emphasis added); *cf. Arizona v. Biden*, 40 F.4th 375, 392 (6th Cir. 2022) (explaining that even mandatory directives don't always "create[] a judicially enforceable mandate"). And, for all we know, the Secretary might determine that the states *hadn't* substantially failed to enforce the nondiscrimination provision. If he made that determination, then HHS couldn't take any enforcement action. So a court order wouldn't redress any claimed injury.

Even if the Secretary found that the states hadn't enforced the provision and he assumed enforcement authority, redressability still isn't certain. The Secretary retains enforcement discretion at every step of the way. *See, e.g.*, 45 C.F.R. § 150.217 (authorizing a preliminary determination if the state hasn't shown substantial enforcement "to [the agency's] satisfaction"). That discretion includes deciding whether to investigate any alleged violations. *See id.* § 150.303(a). And the Secretary may well choose to prioritize other potential violations instead of the allegedly discriminatory practices targeted in this case. After all, the Association alleges that other specialties have brought complaints of discrimination to HHS, too. Plus, even if the Secretary identified a violation, the statute may not require him to impose a penalty at all. *See id.* § 150.305 (providing that violators are "subject to" civil penalties); *cf. United States v. Texas*, 599 U.S. 670, 676, 682 (2023) (holding that a statutory mandate, "without more, does not entitle any particular plaintiff to enforce that mandate in federal court."). Finally, the Secretary also retains discretion over the minimum amount of any penalty imposed. 45 C.F.R. § 150.315. And the amount of the penalty may determine whether insurers are incentivized to change their practices. So even an enforcement action directed against the very insurers allegedly causing harm might not deter them.

Finally, assuming the Secretary *did* impose penalties against the insurers at issue here, it's speculative whether they would respond in a way that redressed the Association's members'

injuries.  In general, plaintiffs lack standing to compel enforcement actions against third parties because it's unclear how those third parties will react.  *See, e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).  It's possible that an insurance company would increase reimbursements for nurse anesthetists, as the Association presumably hopes.  But to remedy any "discrimination," the insurers could simply cut physicians' reimbursement rates as well to equalize reimbursement at the lower rate.  *Cf. Heckler v. Mathews*, 465 U.S. 728, 740 (1984).  And if they did, the Association's members wouldn't receive a remedy for their pocketbook injuries.  Ultimately, we simply don't know what would happen even if the Secretary did begin enforcement.  So it's only speculative that our order would redress the Association's claimed injury.

In sum, even if we granted the Association's requested relief, several speculative events must happen before our order could redress its members' injuries.  And such discretionary enforcement decisions require HHS to balance competing priorities, resource constraints, and policy goals.[5]  *Cf. Texas*, 599 U.S. at 677; *Chaney*, 470 U.S. at 831.  So the Association can't show redressability.

*     *     *

Nurses provide the majority of anesthesia services in this country.  They are both the face and backbone of our health system.  But if they disagree with how the Secretary has exercised his enforcement discretion, they should go to him for a remedy—not the courts.  We affirm.

---

[5] The concurrence raises an interesting argument regarding complete abdication based on the Supreme Court's decision in *United States v. Texas*.  However, *Texas* raises difficult questions that aren't necessary to resolve this case.  While the opinion could be read to suggest a potential exception to existing standing doctrine, 599 U.S. at 682–83, it also speaks in broader terms, seeming to create an independent justiciability doctrine based on whether a lawsuit is "the kind redressable by a federal court." *Id.* at 678.  More importantly, the parties didn't adequately brief these hard issues.  Thus, we are hesitant to take a position on this difficult question without full and thorough briefing.

———————————

## CONCURRENCE

———————————

HELENE N. WHITE, Circuit Judge, concurring in the judgment.  I agree with the majority that the American Association of Nurse Anesthesiology lacks standing.  I write separately because my analysis differs from the majority's and to address the Association's argument based on the Secretary's purported abdication of his statutory responsibilities.

## I.

"[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (citation modified).  "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'  For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified).  To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.*

Courts generally cannot review the decision of an executive officer not to conduct an enforcement action.[1]  But "severe underenforcement potentially violates the constitutional principle underlying separation of powers, and specifically the Presentment Clause, by effectively allowing the President to repeal laws [and] . . . the Take Care Clause because the President either is suspending or dispensing with the laws or is not faithfully executing the laws." Jentry Lanza, *Agency Underenforcement As Reviewable Abdication*, 112 Nw. U. L. Rev. 1171, 1202–03 (2018).  This creates a tension in the balance of powers in our tripartite system: Congress writes the laws and the President enforces them; in what circumstances, if any, does the Judiciary have the obligation to remedy the President's failure to enforce the law?

---

[1]This case involves civil enforcement not criminal prosecution.  As the Supreme Court has recognized, however, "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).

The question whether and under what circumstances a plaintiff has standing to redress harms arising from government inaction implicates overlapping justiciability concerns. First, in an abdication case, the plaintiff is not directly regulated by the government. And the Supreme Court has explained that "unregulated parties may have more difficulty establishing causation— that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Food & Drug Admin. v. All. for Hippocratic Med*., 602 U.S. 367, 382 (2024). Second, the Supreme Court has held that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R. S. v. Richard D*., 410 U. S. 614, 619 (1973).

Although the doctrine of standing arises from Article III not Article II, "the Court's decisions nonetheless use standing doctrine to patrol a perceived constitutional boundary between the executive and the judiciary." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1847 (2016). In its recent analysis of executive inaction, the Supreme Court explicitly channeled its prudential concerns about executive discretion into the Article III standing inquiry. In *United States v. Texas*, 599 U.S. 670 (2023), the Supreme Court held that states lack standing to seek an order requiring the Department of Homeland Security "to alter its arrest policy so that the Department arrests *more* noncitizens." *Id.* at 676. The Court held that the states lacked a "legally and judicially cognizable" injury because the dispute over agency underenforcement is not "traditionally thought to be capable of resolution through the judicial process." *Id.* (citation modified). That holding came despite the monetary injuries alleged by the states and recognized by the district court. *Id.* at 718 (Alito, J., dissenting). The majority cited various prudential reasons for holding that the states nevertheless lacked a cognizable injury, including "the Article II problems raised by judicial review of the Executive Branch's arrest and prosecution policies [and the] . . . general[] lack [of] meaningful standards for assessing the propriety of enforcement choices." *Id.* at 679.

Despite holding that the states lacked standing, the Court in *Texas* noted that "an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 683. The Court cited *Heckler v. Chaney*, 470 U.S. 821 (1985), a case in which it held that the plaintiffs could not challenge the Food and Drug

Administration's failure to institute proceedings against specific drug manufacturers because of the Administrative Procedure Act's "presumption that agency decisions not to institute proceedings are unreviewable." *Id.* at 837. As in *Texas*, the Court in *Heckler* noted that the case did not involve "a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. 833 n. 4 (citing *Adams v. Richardson,* 480 F.2d 1159 (D.C. Cir. 1973) (en banc)). Although not itself a standing case, the majority in *Texas* understood *Heckler* to stand for the proposition that, in some circumstances, extreme government inaction can support Article III standing.**[2]**

*Texas* and *Heckler* thus suggest that courts can remedy complete abdication consistent with the standing doctrine. But the Supreme Court has not clarified how abdication fits into the standing analysis. *Texas* suggests that complete abdication could change the outcome of the standing inquiry, not the inquiry itself. *See* 599 U.S. at 683 ("the standing calculus might change"). In the case of complete abdication, the prudential concerns counseling against court interference with executive discretion give way because the executive has "exceed[ed] the bounds of enforcement discretion." *Id.* In such a case, however, a plaintiff must still meet the standing requirements.

Returning to the case at hand, if we accept the premise that a plaintiff can sometimes establish Article III standing based on agency abdication, we must consider if the Association has established complete abdication. Because the Association fails to establish complete abdication, as discussed below, I agree with the majority that it lacks standing. But acknowledging the potential for plaintiffs to establish standing based on abdication leads me to question the majority's analysis of causation and redressability.

## II.

The Association alleges that, despite insurers blatant and open violation of the law, "HHS itself has never enforced the nondiscrimination provision" of the Affordable Care Act. R. 1,

---

**[2]**And indeed, *Heckler*, 470 U.S. 833 n. 4, invoked *Adams v. Richardson*, 480 F.2d at 1161, a D.C. Circuit case holding that plaintiffs could proceed against a federal agency for abdicating its responsibility to enforce civil rights laws against public educational institutions receiving federal funds.

PageID 19.  But the complaint only alleges that two companies have been violating a statutory provision in a discrete manner for two years.  *See Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 169 (2d Cir. 2004) (no abdication where agency "declines to order demanded action on an asserted discrete, perceived problem within its area of statutory responsibility"); *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994) (no review of "single-shot non-enforcement decision").  Further, under the statute's remedial scheme, the states have initial enforcement responsibility.  The abdication inquiry must therefore account for both the statutory enforcement scheme, under which the federal government must first wait to see if states are substantially enforcing the statute, and the limited number of violations alleged in the complaint.  *See Riverkeeper*, 359 F.3d at 170; *see also* Cass R. Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney*, 52 U. Chi. L. Rev. 653, 670 (1985) ("[T]here is a distinction between exercising [executive] discretion and refusing to carry out obligations that Congress has imposed on the executive.  The distinction turns . . . on interpretation of the substantive statute.").  It is not clear from the record that two years of federal inaction in response to purported violations by two insurance companies, while state governments should be undertaking enforcement, is unreasonable, much less that it constitutes complete abdication.  *Compare In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 274 (D.C. Cir. 2020) (granting mandamus where agency failed to act for nineteen years) *with People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1098 (D.C. Cir. 2015) (no abdication claim based on ten-year interim policy of nonenforcement of animal welfare regulation as to birds).[3]

Given that the Association has not established complete abdication, the prudential concerns set out in *Texas* indicate that the Association lacks a judicially cognizable interest in the exercise of the Secretary's enforcement discretion against third-party insurers.  Without a cognizable injury, the Association lacks standing.[4]

---

[3]On appeal, the Association contends that more insurance companies have instituted discriminatory policies and that neither the states nor the federal government have responded in any way.  I would not decide at this juncture whether these additional allegations support a finding that defendants have now completely abdicated their responsibilities, or whether a plaintiff would have standing to remedy such abdication in a future case.

[4]I acknowledge that the abdication language in *Texas* and *Heckler* raises more questions than it answers.  It remains unclear what a plaintiff must establish when alleging that the government is abdicating its responsibility to enforce the law.  Must the plaintiff identify an express policy?  Or is an obvious practice sufficient?  How long must

**III.**

Although I agree with the majority that the Association lacks standing, the fact that abdication can sometimes support standing leads me to question the majority's analysis of causation and redressability.

In determining that the Association cannot establish causation, the majority focuses on the fact that insurance companies, not the government, imposed the lower reimbursement rates that form the financial injury in this case. But that will always be the case when a plaintiff alleges enforcement abdication—the harm in such a case arises most directly from the actions of a third party, and only indirectly from the government's failure to enforce the law against that third party. If we accept the premise that enforcement abdication can sometimes support standing, and the Supreme Court has repeatedly indicated that it can, then the fact that the government is not acting here does not preclude the Association from establishing causation. Rather, I would consider whether the Association's causal chain connecting the government's inaction to its purported financial injury is predictable, as opposed to merely speculative. *Hippocratic Med.*, 602 U.S. at 383 ("The causation requirement precludes speculative links— that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs.").

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025) provides support for the Association's contention that the Secretary's inaction has caused insurers to continue reimbursing nurse anesthetists less than their physician counterparts. In *Diamond*, the Supreme Court found that fuel producers had standing to challenge a California regulation requiring lower gas-emissions and electrification for carmakers. The Court held that the regulations "likely cause fuel producers' monetary injuries because the regulations likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles." *Id.* at 114. The predictable and likely result of the regulation of a third-party was decreased demand for the plaintiffs' product. Here, the predictable and likely result of the Secretary's alleged inaction is

the agency have been inactive? How many instances of inaction must the plaintiff identify? Must the agency have abdicated its responsibility to enforce a specific statutory directive? Or must it have abdicated its responsibility to enforce an entire statutory scheme? In short, how much inaction is enough?

third-party insurance companies continuing to reimburse nurses at a lower rate, and "[c]ommon sense and basic economics," *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017), hold that increasing the penalty for unlawful conduct affects "business decisions and compliance approaches." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 105 (2d Cir. 2018). Assuming complete abdication and crediting the Association's allegations, it has made an adequate showing that the Secretary's failure to enforce the non-discrimination provision caused the insurance companies to continue paying nurses less. Accordingly, I would not decide the standing issue based on causation.

That leaves redressability. The majority concludes that the Association cannot establish redressability because it is uncertain how the Secretary would respond to a court order requiring him to comply with his statutory obligations and, further, it is uncertain how insurers would respond to any such enforcement. But these concerns again would be present in any abdication case. Take *United States v. Texas*: there, the majority concluded, for prudential reasons, that the states lacked a cognizable interest in compelling the federal government to prosecute more individuals. 599 U.S. at 670. Justice Gorsuch's concurrence, by contrast, determined that the state's lawsuit failed on the redressability prong. *Id.* at 686 (Gorsuch, J., concurring in the judgment). Like the majority here, Justice Gorsuch focused on the discretion that the executive would maintain in response to an order mandating statutory compliance. *See id.* at 693 (Gorsuch, J., concurring) ("an order like that would leave officials with their prosecutorial discretion intact"). The problem is present in this case as well: in response to a court order of compliance, the Secretary could enforce the statute in a manner that ignored the harms claimed by Association members. But unlike Justice Gorsuch's concurrence, the majority in *United States v. Texas* implied that the states could have standing to challenge complete executive abdication of immigration enforcement even though such a case would involve the same redressability problems. *Id.* at 683. I am therefore skeptical of the majority's conclusion that the Association fails on the redressability prong.

I would not decide the case based on redressability. I find persuasive the Association's analogy to the D.C. Circuit decision in *In Re Pub. Emp. for Env't Resp.*, 957 F.3d at 272. In that case, the court found that the petitioners had standing to challenge the failure of federal agencies

to regulate commercial sightseeing flights over national parks through the establishment of statutorily required management plans. *Id.* at 272. The court determined that the management plans were likely to mitigate the noise causing the petitioners' injuries. *Id.* at 272. The court noted that the petitioners did not need to demonstrate that redress was certain, merely that it was substantially likely; it therefore did not matter that there was "no guarantee" that the management plans would redress the harm to the petitioners. *Id.* (citation modified). Here, I would find it substantially likely that, if the district court ordered the Secretary to enforce the nondiscrimination provision, at least some of the Association's members would see their financial injury mitigated. At the pleading stage, that is sufficient to establish redressability.

*        *        *

Although I disagree with some of the majority's analysis, I ultimately agree that the Association lacks standing, given its failure, thus far, to establish that the Secretary has completely abdicated his responsibility. I therefore concur in the judgment.